Good morning. I'm Matthew Devlin on behalf of the plaintiff, Timothy Hauk. Also with me is my co-counsel, Michael Braun. I'd like to ask, before I start, I'd like to ask the court permission. We did prepare a couple of blow-ups to the critical documents that are in the record that it might be helpful to know. Well, number one, you're supposed to kind of in advance deal with these things, but I certainly can't see that from here. Well, I would bring it up closer with the co-counsel's permission. Have you had an opportunity to view that? I have not. The counsel informed me earlier that he had a blow-up of a particular exhibit, but I haven't seen it. Well, I don't think it's, you know, at this point, I don't think it's appropriate if the counsel hasn't seen it. Okay. You've got 15 minutes. I don't know what's your position. It's not counsel's representation of what the blow-up is. If I could have, I'd be happy if I had a minute to look at it. We can't read it anyway from here. Well, I was going to have it brought up closer here. Well, I don't really want you right here. Okay. Well, I'm not right here. If the court doesn't want it, that's fine. I can do without it. I mean, generally in the future, you need to have counsel look at it. You need to seek permission, and generally it would be something that if we were going to look at it, you would have a copy that we could read right up here as opposed to holding oral argument six inches from us. Okay. I will keep that in mind for the future. Okay. Thank you. I apologize. All right. Can we go back and start the clock since we've spent a lot of time talking about this? I apologize. Okay. Go ahead. May it please the Court. Matthew Zevin on behalf of the Plaintiff and Appellant Timothy Hawk. Good morning. Good morning. This case at its fundamental core is about a bait-and-switch. The bait, of course, was the 4.99 percent fixed APR balance transfer offer that the defendant Chase Bank sent to Plaintiff Timothy Hawk and millions of its customers in October of 2004. And like millions of Chase's customers, Mr. Hawk took the bait. On October 13, 2004, he called Chase up, verbally accepted the offer, and arranged to transfer over $10,000 to his Chase account. Then came the switch. Instead of charging Mr. Hawk the 4.99 percent that was promised in the balance transfer offer, Chase immediately raised the interest rate to almost 29 percent. In fact, Mr. Hawk never received the benefit of the 4.99 percent offer, not even for one day. And why did he not receive the 4.99 percent? Well, it was not because of something that he did after he accepted the offer. Instead, it was something that happened three months before he accepted the balance transfer offer. Could I actually direct your attention to that language? The court, in looking at the language in the terms of offer, the term of offer, said that the language was clear, the one that said, any promotional rate or regular preferred pricing may change to your non-preferred APR if any minimum payment on any loan or account of yours with us or your other creditors was not made by the payment due date. And the district court thought that was clear, that that related to events that happened in the past. Can you tell me what your construction is of that language, so either it's ambiguous or it only refers to future events? My construction of the language is that, at best, it's vague and ambiguous and confusing. Can you explain why that is, looking at the language of that? The district court was impressed by the fact that it said, was not made a past chance seeming to relate to a past event. Because if you look at the whole context of the balance transfer offer, I don't think you can look at this in isolation. Everything else in it says you can get this balance transfer at 4.99 percent. To be eligible, you have to be eligible for preferred pricing as deemed by your original card member agreement. And then it talks about, this isn't talking about eligibility for the 4.99 percent rate, it's talking about a change, assuming you're already eligible. So it's mixing the assumption that you're eligible with an event that took place in the past that would say suddenly you're not eligible anymore. On the truth in lending part of it, we have to look at the language to see, because the summary judgment was granted, you have to look at the language, just as Judge Ikuda has asked you to look at it, to see if it's a clear disclosure. And why isn't it? I mean, when you talk about your state claims, that might be a different situation, but why doesn't that clearly say, it uses the word was. It does use the word was, but I would say in the whole context it's confusing because it's mixing tense. This court, the Ninth Circuit, just recently came down with the Williams v. Gerber case that has been submitted by my opposing counsel. And there the court quoted a U.S. Supreme Court case where it said, it is not difficult to choose statements, designs, and devices which will not deceive. And it would have been very clear and easy for Chase to have said, you are not eligible for this low 4.99% rate if you have ever in your life made a late payment to us or another creditor. That would have been clear. That would have been conspicuous. Instead, they hide this on the back of the balance transfer offer in fine print and use what I believe is very confusing language because it is also talking, there's also language in there that is talking about something happening in the future. It's talking about your eligibility as of the present date. And if you look at all of the disclosures together, it's mixing past, present, and future tense. I would say it's hardly clear and conspicuous. In fact, if you took the district court's reading of this to its extreme, it would make no sense because there's no temporal restrictions to it. Under the district court's reading of this language, Chase could accept a balance transfer and then any time in the future, it could be the next day, it could be a week, it could be a month, it could be two years, look back and say, oh, we see that 10 or 20 or 30 years ago you were late on a payment, a student loan payment or a car payment. So, sorry, we're immediately going to raise your interest rate. Gotcha. And respectfully, a reasonable consumer would not read this to, nobody would ever put themselves in that situation. So, it just doesn't make sense under Chase's reading of that language. Nobody would ever put themselves in that situation. And the Truth in Lending Act was specifically designed to avoid and prohibit these types of gotcha situations where you don't know what is going to happen. And it's particularly compounded because before that disclosure, Chase says that the terms of your card member agreement relating to balance transfers apply to balance transfer transactions from this offer. And that's very important because it's also incorporating in the terms of the original card member agreement. And in the original card member agreement, Chase says some very important things. It says you are in default from this point forward if you are ever late on a payment to us or any other creditors. And then we can, in the future, raise your interest rate. However, even if you are in default based on a late payment to another creditor, we can exercise our right to extend you a low interest balance transfer offer nevertheless. So, if a customer read the two of those together, they would have no way of knowing if they're being extended this low interest balance transfer offer despite the existence of a prior late payment or if they're suddenly going to get hit with a default rate because of a prior late payment. Let me ask you this. You say, Rossman, to us, a Third Circuit case, which interprets the Truth in Lending Act's clearness requirement as including statements that are misleading, that those are prohibited by TULA as well. If we were to agree with the Third Circuit, would that require an extension of Ninth Circuit law? Is there Ninth Circuit cases which would say misleading or ambiguous statements? I don't think it's an extension of Ninth Circuit law. I don't know that the Ninth Circuit has specifically ruled on that particular language, but I think it's just consistent with the Truth in Lending Act in general. And remember, the Truth in Lending Act is, in general, it was enacted to assure meaningful disclosures so that consumers can make informed credit decisions. So, the consumer has to know what they're getting themselves into. And under Regulation Z, which is promulgated under the Truth in Lending Act, there are general disclosure requirements at 12 CFR 226.5 that say, the creditor shall make the disclosures required by this subpart clearly and conspicuously in writing. And then some of the, if you follow down the path of TULA to 226.62A2, it talks about the circumstances which will lead to an interest rate change are one of those things that needs to be clearly and conspicuously disclosed. Is that applicable? That particular regulation does not apply to initial credit offerings? It does, but then 12 CFR 226.9 refers to subsequent disclosure requirements, and specifically 226.9B2 says that whenever a credit feature is added or a credit device is mailed or delivered and the finance charge terms for the feature or device differ from disclosures previously given, the disclosures required by 226.6A must be given. So, by reference, it requires the same thing in the subsequent disclosure. Again, if you compare the card member agreement, which is specifically incorporated into the balance transfer offer, and if you were to read the two together, it is completely ambiguous and confusing because a consumer would have absolutely no idea whether they're going to get the benefits of the balance transfer offer or not. And that leads me to our claim under the unfair prong of the uncompetition law. Well, in your state court claims, do they depend on a showing that Chase knew of the prior late payment prior to October 13, 2004? And if not, why not? I'm glad you asked that. First, under none of our claims, under the Truth in Lending Act or the unfair competition law claims, do we need to show any state of mind? We don't need to show intent. We don't need to show that they intended to pull a bait and switch. We don't need to show that they knowingly did this. They're both strict liability statutes. The Truth in Lending Act is strict liability, and the unfair competition law claims are strict liability. So it doesn't matter if Chase was doing this with a bad intent or not. The question is whether or not a consumer could make an informed credit decision. No, but Judge Callahan's question is not bad intent but knowledge. Does it depend upon knowledge? Neither claim depends on knowledge. There's a specific case law on the UCL that says that knowledge is not required. We don't have to show any state of mind or any knowledge. Now, Chase is raising a statutory standing argument, I guess, under Prop 64. Was that argument raised to the district court? It was not, and I cited that. I argued that in my reply brief that it was not raised before. I don't think it would matter at the end of the day because I think it's very clear that, obviously, Mr. Hawk relied on the balance transfer offer, and if something was not disclosed, it was not disclosed. There's nothing for him to look at to rely on. It was simply reliance on the fact that something was not disclosed, and specifically it was not clearly and conspicuously disclosed that something that happened in his past before he accepted the balance transfer offer was suddenly going to lead to a sudden increase in his interest rate. I'm still having trouble with your answer to that last question. Doesn't whatever knowledge Chase might have had have some relevance to the unfair competition claim? Well, the unfair competition claim, there's two claims. There's a fraudulent prong and an unfairness prong. The fraudulent prong is decided whether or not a statement or disclosure was likely to deceive a reasonable consumer. It doesn't matter if it's just focusing on the disclosure itself. So under the fraudulent prong of the UCL, we're just looking at the disclosure and whether or not it was likely to deceive a reasonable consumer, period. It has nothing to do with Chase's state of mind or knowledge of anything. The second claim is under the unfair prong of the UCL, and unfairness is measured by balancing the utility of a defendant's conduct versus the gravity of the harm to consumers. Even if you were to find that the disclosures were so clear and conspicuous that a consumer could never be confused by this, it still could be rendered an unfair practice, and I'll tell you why. It is apparently unfair for Chase to extend a balance transfer offer and accept a consumer's money only to then subsequently raise the interest rate based on something that took place before they accepted the offer. And that is, in short here, Chase hedged its bet. It originally said in its card member agreement that you're in default. Whether it's unfair, don't you think the fact that they may have known about that prior debt earlier, isn't that relevant to the claim? I would say it would make it extraordinarily unfair if they knew about it. If they didn't know about it, it's still an unfair practice because it's shifting the risk to the consumer. Based on the disclosures and the terms of the credit agreement, the consumer is never going to know if they're going to get the benefits of the balance transfer or not until they shift the money. They have to transfer the money and just guess whether or not Chase is going to use its right in the card member agreement to give the balance transfer despite the prior late payment or whether it's going to use the terms of the balance transfer that it says allow it to raise the interest rate because of the past payment. Isn't there strong evidence in the record that they did know about the prior late claim? Exceptionally strong evidence. But isn't that relevant then to your unfair competition? Well, it is relevant, certainly. It is very relevant. It's not required, though. But I was going to get to that point. Even if you were told that we do need to show Chase's prior knowledge, there's a ton of evidence in the record that Chase knew or at least should have known about the prior late payment. For example, we submitted substantial evidence that Mr. Hawk's late payment was reported to Experian in July and August of 2004. I don't know if you want to reserve any time. I did want to reserve a couple minutes. Well, you're down to 1.17, so you might want to. Okay. I'll wrap it up right now. We also have substantial evidence that current events, such as a late payment, immediately appear on a credit report, and we know that Chase obtained Mr. Hawk's credit report in both August and September of 2004, both of which were at least a month or two months before Mr. Hawk accepted a balance transfer offer. Therefore, even if we had to show Chase's knowledge, there's at least a tribal issue of material fact regarding whether or not they had knowledge of the late payment. And I will reserve whatever time I have left. Thank you. Thank you. Good morning. Good morning, Your Honors. Bob Stern from Morrison & Forrester on behalf of Appalachia Chase. May it please the Court. Let me begin by making clear what Chase does not contend here, because it's a little confused, given how the arguments have been characterized. Chase does not contend that it has a right to effect a balance transfer at an advertised promotional interest rate, and then immediately after the debt is transferred over, revoke that promotional interest rate on the basis of a prior default that it already knew about when it effected the transfer. That is not Chase's position. Chase's position is that given the agreements, and I want to get into them with you in a moment, it had a right to act upon information once it received it. Well, I guess I'm having a little trouble about that. I mean, what if you had the credit offer, which was accepted, and then you didn't know about this event that happened 30 years ago or 10 years ago, and then somebody who has it in for the credit card holder blows the whistle and lets you know you've got this new information. Then you can change the credit rate to the 30 percent based on something that happened 10 years ago? I mean, that would be consistent with what you just said. It's not the way the system works in practice. Yeah, that's not how it works in practice, but I'm interested in, does the language as you interpret it allow you to do that? The language, well, frankly, yes, to be honest. But that's such an extraordinary circumstance. It's hard to imagine it could ever happen. Chase has an interest. So then really that comment is sort of a make-nice comment because really the contention is that your contention on the TILA claim is that the language is clear and the was means was, and so it could be 30 years or whatever. That's correct. But let me read a couple other parts of the agreement. The card member agreement also says, clearly Chase relies upon third-party credit reporting agencies in order to determine whether there have been off-Chase defaults, whether there have been defaults with other creditors. Chase obviously has contracts with those companies. They report the information to Chase. Chase doesn't get reports 10 years after the fact about whether there's been a default. It can't act, however, and this is the indisputable fact, until it receives the information. With the language that the district court found was clear, the thus are your other creditors was not made by the payment due date, where do you see or how do you interpret that to include provided that Chase has this information, the knowledge element? What's the source of that loss? Chase says in its card member agreement that it will rely upon information from credit bureaus in order to determine eligibility. It defines eligibility in part as not having made defaults with other creditors. So put those two together, Chase has to rely on third-party credit information in order to evaluate defaults and consider non-preferred pricing. It's reliant upon that information, and it makes that, I think, clear in the card member agreement. I'd like to refer you, I'd like to come back to the governing regulation and Regulation Z. There was conversation about several different provisions in Regulation Z, and it's important to focus on the actual language. The only provision here in TILA that is relevant, or in Reg Z that is relevant, is Section 226A2. Your Honor pointed out earlier that 226.5 refers to solicitations. They refer to that section. That's not what this is. The solicitation is when there is not a preexisting card member agreement, which there was here. So it's 226A2. 226A2 specifically requires disclosure of the circumstances under which the finance charge will be imposed. There's no debate here about whether that was disclosed. Chase does disclose in its card member agreement when finance charges will be imposed. The issue here is about how Chase discloses changes of the finance charge, and that is not specifically covered in the language of 226.A2. So what do plaintiffs rely upon? They rely upon a comment by the Federal Reserve Board under 226.6A2, and that comment specifically says that Chase must disclose, the creditor must disclose the specific event that may result in the increased rate. Chase has plainly disclosed the specific event that may result in the increased rate here. That is default with another creditor. Why isn't it confusing like what the appellant says that why wouldn't a reasonable consumer have expected Chase to have known of a late payment if they actually make the offer? A reasonable consumer looking at these documents presumably would know that Chase is, as I said, reliant upon third parties to give it the information. They can't act upon it unless it knows it. But how would the reasonable credit card holder know that Experian had reported something that happened three months ago or a year ago or whatever? I mean, how would the credit card holder have that information? If the credit card holder knew, as in this case, there had been a recent default and wanted to know whether that was going to impact the consumer's ability to get this preferred rate, they could simply call customer service at Chase and ask the question. So the due diligence and the risk is on the part of the consumer. The due diligence is also on the part of Chase. It gets the information from the credit reporting agency and it acts upon it. It's not free of due diligence. But I think we have to go back and look at what the requirement is here. TILA is not a general consumer protection statute that allows anyone to write into it whatever they want as a requirement, in this case credit card issuers. There's plenty of case law that says the Federal Reserve Board made very careful judgments within TILA as to what has to be disclosed. And here, as I was mentioning, the comment plaintiffs rely upon says Chase must only disclose the event that gives rise to the increase. And this is very important. The comment they rely upon gives one example of how such a disclosure may appear that would be permissible under TILA. And the one example they give is, quote, 22% APR if 60 days late. Nothing in there about, well, 60 days late from when, when did the default occur. It's simply disclosure of the event that may give rise to the increase. Here Chase discloses the event. Default with another creditor. There's another provision here that I want you to explain how this applies. This may apply more to the unfair competition claim than the TILA claim. This paragraph 4 says, we may waive our rights, such as our right to enforce a non-preferred rate on existing and new balances until paid in full or to enforce any minimum non-preferred note. However, if we do waive any of our rights and there is another occurrence when you do not meet the conditions described above to be eligible for preferred rates, we may again impose a non-preferred rate up to the maximum non-preferred rate. How does that apply or qualify this other language? Your Honor, could I ask you to direct me to where that passage is? Yes, it's in paragraph 4, and it's under the heading terms for purchases, no, terms for balance transfers, advances, and purchases. You're referring to the first paragraph under number 4? Paragraph 4. No, the third paragraph under paragraph 4. That's the reading statement paragraph. Counsel referred earlier to the reading statement paragraph. It begins, if you do not meet all these conditions. Yes, that's the paragraph. Right, right. And it's near the bottom, and it's in the middle of the sentence. It starts, we may waive our right. I'm sorry, the reason I'm pausing is that's not specific language that's been referenced in any of the briefs. Here, let me hand it to you. I've got it. It's at the bottom of this page down here. Starting there. Okay. That whole paragraph refers to a situation where the customer has first lost the non-preferred right. That's the way the paragraph begins. It doesn't apply where they started off with the? Exactly right. And that's the flaw in the argument they try to make about creating some confusion here about this right to reinstate. Everything in that paragraph presupposes, and it's the way the paragraph begins, that first the customer has lost the preferred right. Now Chase has the right. And it says if the consumer continues paying on time for a period up to 12 months, then Chase has the right to reinstate the deferred right or perhaps lower the non-preferred right. But it all presupposes a preexisting relationship where there's been a loss of the preferred right. That's not the situation here. There was no loss in the reinstatement. There was simply a loss. There was a loss of the preferred right, period. I'd also like, unless you had a further question about that, Judge, I'd like to refer you to the specific language, again, of the disclosure. Your Honors have referred to it, and Judge Below, Judge Wilson, was persuaded by it that it clearly described what was going to happen. That is the balance transfer offer itself, not the carbon agreement, but the two-page balance transfer offer. They had a precious little print on it. Among that little print, it says specifically that the special rate applies only when the person is eligible for preferred rights. There's no guarantee on the face of that offer that come hell or high water, you get the rates specified on the offer. Chase sends these offers to a lot of people, and it knows when it sends the offer that it's reliant on third parties to determine whether the party's going to be eligible or not. So if someone calls up and says, well, I'd like to take advantage of this preferred rate, and Chase says, okay, we'll institute that on your next account statement, what is it that would lead the reasonable consumer to say, well, I could be retroactively non-eligible even though Chase has now proffered this rate? The reasonable consumer knows from the disclosures that Chase has to wait until it gets information about prior defaults. Well, what are you basing the offer on, though? What are you basing the offer on? On the credit data available to Chase when it makes the offer. There's a lot of information in the record about how, given the large number of offers that go out, this process begins months in advance. And the evidence was that the offer actually went out in the mail. I think it was in late July. So Chase says, well, we don't know whether you're eligible or not because we have to rely on credit reports, but go ahead and transfer your money to this account, and we'll decide at some later point whether to give you the 4.99% or the 30%. I mean, that's what troubles me in this interchange. I understand that, but that's not what Chase is saying. Chase is saying that based upon all the information we have available to us right now, you are eligible for this. When they accept the balance transfer, they're saying, based upon what we know now, you are eligible for this. Now, something could happen in the future. We get information in the future. You could have defaults hereafter or defaults from the past we just learned about. Something could change in the future that would make that rate go away. But based upon everything we have right now, you are eligible for that rate. They would not affect the transfer unless that were the case. That's what the testimony showed. So if we find from the record that there is a triable issue of fact as to whether you did know about that previous default, then you lose? Yes. If you find there was a triable, well, what you have to find, that's under the unfair prong of the UCL only. That has nothing to do with TILA. It has nothing to do with the fraudulent prong of the UCL. So under TILA, whether you knew or not or there's a triable issue doesn't have anything to do with TILA. TILA is strictly based upon the disclosure language. The language and the disclosure. And the specific sections of TILA that tell us what we have to disclose. Right. Under the unfair prong of the UCL, the test is whether after balancing the impact of the practice upon the plaintiff and the motives and justifications of Chase in instituting the practice, on balance it's unfair or not. Well, why hasn't plaintiff or appellant presented enough to show that there is a triable issue on that? To keep the state claims alive. Yes, Your Honor. Because there is a wealth of evidence on the other side of the issue, and I'm going to get to what evidence they refer to. But we have testimony from – I don't want to weigh evidence. Remember that, because it's summary judgment. Right. But the lie is that if the evidence is inherently untrustworthy, that does not overturn summary judgment. You're right there. You're absolutely right in stating the standard. You do not sit here and weigh evidence on summary judgment. But if the only evidence they have is inherently untrustworthy, the Dickman case in the Southern District of California a couple of years ago set out that standard. And many courts have said that if there's merely some existence of an alleged factual dispute, that's not enough to overturn summary judgment. All they have to go on was the very confused testimony of a witness from experiment who testified, on the one hand, as they say – But they're entitled to all inferences in their favor. So why weren't the – you know, the person from experience, why doesn't that create a tribal issue? It may not save the day in the end of the trial, but why doesn't it create a tribal issue here? Because in the end, the evidence that the testimony they cite to is inherently untrustworthy. She said repeatedly – she was confused by the questioning from counsel. She said repeatedly during the deposition, in addition to what they cite to, that she could not tell from the documents Experian had when it received the report from Homecoming's funding, the other creditor. She said that she could not tell when Chase received the information from Experian about the default. So her testimony in the end was very confused. She went back and forth repeatedly. And because of all that, the judge below said that it would take pure speculation to say that Chase knew about this, knew about the default when it made – affected the transfer. On the other side of that issue, Chase presented evidence, documents, and testimony to the effect that it couldn't have known – it did not know about this default until mid-October, at least several days after the balance transfer was effected. It had records showing what it had received from Experian. Experian did not report this default to Chase until mid-October, according to that information. It also had other records that were testified about to the effect that Chase looked – Chase looks every month, as it discloses in its card member agreement, at eligibility. And it looked at eligibility in September, as late as September, and concluded this person was still eligible for preferred pricing. And it kept the preferred pricing intact. It wasn't until it got the information in mid-October, the testimony showed, that it changed the preferred pricing. So there's a wealth of evidence showing that Chase did not have the information when it affected the balance transfer. And only the very confused testimony of an Experian witness, who said she was confused, repeatedly. All right. Unless the panel has any additional questions, you're in over time. Okay. Thank you, Your Honor. Thank you for your argument. Thank you. Just briefly. Maybe you can just, I don't know, for my benefit, why don't you just address what evidence is it that you have that makes a tribal issue? Certainly. With respect to the unfair – that's the unfair prong of the UCL claim. I would beg to differ with counsel's interpretation of the Experian witness testimony. I think it's abundantly clear what she said several times before they had a break, which is on the record that there was a break. Counsel spoke together, and then counsel spoke with the witness, and then the witness came back and started changing the testimony. And that is in the record. On top of that, forget about what the witness said. We submitted a March of 2005 credit report from Experian that shows Chase Bank reporting Mr. Hawk is current as of March 2005. And it shows that for several different creditors. That document demonstrates that when a creditor reports something to Experian, it shows up immediately on that credit report, which is not a big surprise. And we also have evidence, credible evidence, that Homecoming Funding reported the late payment to Experian in July of 2004 and in August of 2004. We're talking two months later here in October of 2004. At a minimum, that creates a tribal issue of fact as to whether or not Chase knew about this. I would just like to clarify that our disclosure claims, we have two disclosure claims, one under the Truth in Lending Act, one under the fraudulent prong of the state unfair competition law. And for those claims, it does not matter what Chase did or intended to do. What matters is whether or not these disclosures were clear and conspicuous so that a consumer could make an informed credit decision. And I would submit if it's the fine print that gets you, it's not clear and conspicuous. And if it takes three lawyers and three judges to try and figure out what it is Chase is trying to tell you here about a late payment that takes place before you get this balance transfer offer, when you read it in the context of the balance transfer offer and the card member agreement, it is hardly clear and conspicuous. At a minimum, it is a tribal issue that a jury should be looking at. Before you conclude, do you have in mind the language that I asked Mr. Stern about? Vaguely, yes. Did you disagree with his interpretation of it? I do. If I could pull it up real quick. I think this whole section is a little bit confusing because it's talking about, obviously this card member, these clauses don't go into effect until you open your relationship with Chase. So this is the original card member agreement and the relationship starts. And it says, from this point forward, if you're ever late on a payment, then we can give you a default rate. And then it says, nevertheless, even if you are in default at some point in the future, we can reserve our rights and waive our rights and give you a new balance transfer offer under lower terms. But if you default again after that, then we can raise your rate again. That's the way I read this. Thank you. Thank you both for your argument. This matter will stand submitted. I'll call the next matter on calendar.
judges: Callahan, Ikuta, Shubb